Cheryl Ann **PIECHOWICZ**, Individually and as Personal Representative of the Estate of David Scott Piechowicz; Sherrie Marie Waldrup, a minor by Cheryl Ann Piechowicz, her mother and next friend; Melva Kennedy, "to the use of Walter Piechowicz" "to the use of Florence Piechowicz" "to the use of Reliance Insurance Company"; John I. Kennedy, Jr., Individually and as Personal Representative of the Estate of Susan C. Kennedy, Plaintiffs–Appellants,

v.

**UNITED STATES** of America; James Savage, Individually and as Assistant United States Attorney for the District of Maryland; John Ryan, Individually and as an Agent of the Drug Enforcement Administration of the United States, Defendants–Appellees.

Cheryl Ann **PIECHOWICZ**, Individually and as Personal Representative of the Estate of David Scott Piechowicz; Sherrie Marie Waldrup, a minor by Cheryl Ann Piechowicz, her mother and next friend; John I. Kennedy, Jr., Individually and as Personal Representative of the Estate of Susan C. Kennedy; Melva Kennedy, "to the use of Walter Piechowicz" "to the use of Florence Piechowicz" "to the use of Reliance Insurance Company", Plaintiffs–Appellants,

v.

**UNITED STATES** of America; James Savage, Individually and as Assistant United States Attorney for the District of Maryland; John Ryan, Individually and as an Agent of the Drug Enforcement Administration of the United States, Defendants–Appellees.

Nos. 88–2099, 88–2100.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1989.

Decided Sept. 20, 1989.

See also, D.C., 685 F.Supp. 486.

Stephen Norman Goldberg (Cohn & Goldberg, Daniel J. Dregier, Jr., Allewalt & Murphy, P.A., Baltimore, Md., on brief) for plaintiffs-appellants.

John Frederick Cordes, Jr. (John R. Bolton, Asst. Atty. Gen., Breckinridge L. Willcox, U.S. Atty., Jay S. Bybee, Appellate Staff, Civ. Div., U.S. Dept. of Justice, Washington, D.C., on brief) for defendants-appellees.

Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

ERVIN, Chief Judge:

This action pits a number of plaintiffs, understandably grieved at the murder of two relatives by a contract killer, against the United States and two of its agents, whom the plaintiffs believe did too little to prevent the tragedy. The district court dismissed the action on the defendants' motions, holding them immune from suit for the challenged decisions. We have every sympathy for the plaintiffs' loss, but must agree with the district court that their claims will not lie against these defendants. Accordingly, we affirm.

## I.

### A.

Plaintiffs sued James Savage, an Assistant U.S. Attorney, and John Ryan, a Drug Enforcement Administration ("DEA") agent, (collectively "the agents") and the United States on twelve counts stemming from the murders of their relatives David Piechowicz and Susan Kennedy ("the Piechowiczes"). The counts—six under the Federal Tort Claims Act ("FTCA") and six under the Fifth Amendment—sought a total of $120,000,000.00 for acts the plaintiffs alleged had negligently or recklessly led to the murders.

Plaintiffs moved early in the suit to disqualify all the judges in the forum, the District of Maryland, as possibly partial toward Savage, who frequently appeared before them. 28 U.S.C. § 455(a). Judge Kaufman denied the motion, observing that he "has had no relationship with [Savage] except in the course of [Savage's] appearances before this court and an occasional contact at receptions or the like" and that this relationship was much less than the judge enjoyed with attorneys over whom he would not hesitate to sit in criminal judgment.

The district court subsequently granted Savage's and Ryan's motions to dismiss based on their qualified immunity. The court then granted the United States summary judgment under the discretionary function exception to the FTCA.[1] 28 U.S.C. § 2680(a). Plaintiffs have appealed the orders dismissing the defendants and refusing to disqualify Judge Kaufman and, perhaps, his colleagues.

### B.

On November 10, 1982, federal marshals arrested Anthony Grandison in Baltimore.

---

1. The district court held, as it should, that the application of § 2680(a) deprived it of subject-matter jurisdiction over the claims against the United States. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980).

The marshals suspected that Grandison had violated the terms of his parole from a five-year sentence for assaulting DEA agents. When the marshals searched Grandison, they found a key to a room at Baltimore's Warren House Hotel.

A couple of hours after Grandison's arrest, David Piechowicz, manager of the Warren House, was accosted by a woman named Joyce Kelly. Kelly claimed to be Grandison's sister and said she had to retrieve Grandison's belongings from his room. Kelly was really the mother of one of Grandison's associates, whom Grandison had told to "take care of that thing" as the marshals led him into custody. David refused to allow Kelly in the room without Grandison's permission. When David phoned the number Kelly gave him to contact Grandison, who Kelly said had been arrested, David found himself talking to the FBI.

After the call, David went into Grandison's room and took out three bags. David recognized drug paraphernalia in one bag and clothes in a second. A later FBI inventory of the bags also turned up a revolver. The third bag was locked, but FBI agents later opened it under warrant and discovered about 100 grams of heroin and 122 grams of cocaine, as well as over four pounds of cutting substances.

The United States subpoenaed David and his wife, Cheryl Piechowicz, a Warren House employee who said she had seen Grandison enter and leave his room a number of times, to support its opposition to Grandison's motion to suppress the contents of the locked bag. Both were also subpoenaed to testify at Grandison's trial on the drug and firearms charges inspired by the Warren House evidence. Savage was the United States' representative in both proceedings.

Just before Cheryl was to testify at the suppression hearing, a woman named Janet Moore approached her and said something like "If I were you I'd say I never saw him before in my life." Cheryl told John Ryan, a DEA agent she knew was working on the case, about this. Ryan identified Moore as Grandison's common-law wife. Cheryl stated that "[Ryan] seemed very concerned. He said this was nothing to take lightly, we need to report this to [Savage]."

Cheryl and Ryan then went to Savage's office, where Cheryl recounted Moore's statements. Cheryl says Savage did not believe it necessary to report the incident as a threat, and that Ryan seemed surprised at this. Savage then told Judge Howard, who was presiding over the hearing, about Moore's remark. During the hearing, the judge issued a blanket warning against threatening witnesses to all persons present in the courtroom. No United States agent offered to protect the Piechowiczes, and they in turn did not ask for or rely on U.S. protection.

On April 28, 1983, five days before Grandison's trial was set to begin, a hired killer named Vernon Lee Evans walked into the Warren House and used a silenced machine gun to murder David and his sister-in-law, Susan Kennedy. Evans appears to have mistaken Susan, who also worked at the Warren House, for Cheryl.[2] An affidavit in the record before us suggests that Grandison had colluded with Evans in the attempted murder of a federal drug witness in 1979.

Savage says he was not familiar with the 1979 incident until after the Warren House murders. Savage also says he knew of no specific violent propensities of Grandison or his associates. Ryan was likewise unfamiliar with Grandison's complicity in the 1979 assault, or with anything hinting that Grandison's repertoire might include mur-

2. Our decision affirming the convictions of Moore, Grandison, Evans, and a fourth man for conspiring to violate David's and Susan's civil rights and for witness tampering gives a fuller account of the machinations among the conspirators, which leave no doubt that Grandison was the prime mover. *United States v. Grandison,* 780 F.2d 425 (4th Cir.1985).

Grandison's trial on the Warren House drug and firearms charges ended with a conviction on all counts and a total sentence of eight years in prison, five years special parole, and $55,-000.00 in fines. *United States v. Grandison,* 783 F.2d 1152 (4th Cir.1986) (affirming the convictions and sentence).

der. Ryan states he "never advised a citizen witness to change work or routines or anything" and had never sequestered non-informant witnesses.

## II.

### A.

■ We deal first, and briefly, with plaintiffs' argument that Judge Kaufman erred in refusing to disqualify himself.[3] Our inquiry is whether it was an abuse of discretion for the judge to conclude that the circumstances would not have led a reasonable person to question his partiality. *United States v. Carmichael*, 726 F.2d 158, 160 (4th Cir.1984); *SCA Services, Inc. v. Morgan*, 557 F.2d 110 (7th Cir.1977); *United States v. Ferguson*, 550 F.Supp. 1256 (S.D.N.Y.1982). We conclude it was not.

■ We find no indication that Savage's relationship with Judge Kaufman was so intimate as to suggest any appearance of partiality. *Ferguson*, 550 F.Supp. at 1260 (district judge explains that he disqualified himself because his relationship with the U.S. Attorney, a former law clerk, is "so intimate and my esteem for him so high", and the attorney's credibility so probably crucial, that an appearance of partiality is likely); see also *In re Beard*, 811 F.2d 818 (4th Cir.1987) (upholding district judge's refusal to disqualify himself from the Robins' family bankruptcy proceeding because he had referred to a family member as a "fine man" and noting that "[t]here is no evidence in the record that [the judge] is a friend of Mr. Robins or that such acquaintance as exists could be seen as affecting his judgment...."). The docket sheet records a request for a jury trial in the case, making even less likely the perception that a partial judge might be called upon to make important credibility determinations. In short, evidence that could prompt an

impression of partiality is so scant that the judge's refusal to remove himself was clearly within his discretion.

### B.

We here grapple with the more difficult issue whether the acts and failures to act that the plaintiffs allege left David and Susan at the mercy of Grandison and his henchmen comprise a "discretionary function" for which the United States is immune from suit.[4] We believe that federal statutes and regulations gave Savage and Ryan, the agents through whose conduct the United States may be liable, discretion to make the policy choice whether to offer protection to the Piechowiczes. Under a long line of cases interpreting § 2680(a), this is just the sort of choice the discretionary function exception insulates from judicial scrutiny.

In *Berkovitz v. United States*, 486 U.S. 531, —— – ——, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531, 540–41 (1988), the Court made clear the sweep of the discretionary function exception. The exception "insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Id.* at ——, 108 S.Ct. at 1959, 100 L.Ed.2d at 541. This conclusion synthesized a two-part test the Court implied should control in any discretionary function case.

■ The threshold inquiry is whether the challenged conduct "involves an element of judgment or choice." *Id.* (citing *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953)). The Court observed that a federal statute, regulation, or policy may, by prescribing a specific course of action, leave an agent "no rightful option but to adhere to the directive". *Id.* at ——, 108 S.Ct. at 1959, 100 L.Ed.2d at 541. In such an instance, the governing standard obviates any ele-

---

**3.** We realize that the thrust of the plaintiffs' motion was to disqualify all of the judges in the district. Without granting that such a step could ever be warranted, and leaving aside the problematic procedure for doing so, we believe that Judge Kaufman's decision on his own fitness to hear the case, which we affirm today,

mooted the broader issues implicated in the motion.

**4.** We need not and do not decide the merits issue whether, assuming the challenged acts of the United States leave it vulnerable to suit, negligence or recklessness subsists in the acts.

ment of judgment on the agent's part, and the discretionary function exception cannot apply.

The exception does not, however, protect every activity involving an exercise of judgment. *Berkovitz* observed that "[t]he basis for the ... exception was Congress' desire to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." " *Id.* (citing *United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984)). From this principle the Court derived the conclusion that "[t]he exception ... protects only governmental actions and decisions based on considerations of public policy." *Id.* (citing *Dalehite,* 346 U.S. at 36, 73 S.Ct. at 968).

■ Turning to the facts of this case, we first explore whether, under *Berkovitz,* the applicable directives committed the decision whether to offer protection to Savage and Ryan "as a matter of choice" for Savage and Ryan or whether the directives "specifically prescribe[d] [their] course of action." *Id.* at ——, 108 S.Ct. at 1958–59, 100 L.Ed.2d at 540–41. We conclude that the federal witness protection statutes and regulations grant the agents supervising a case considerable latitude to decide whether and how to protect witnesses, and hence

that the decision was a matter of choice for the agents involved in the Grandison case.[5]

The pertinent standards are those promulgated under the authority of the Organized Crime Control Act of 1970 ("OCCA")[6] and the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 1512. Title 9 of the U.S. Attorneys' Manual—Criminal Division ("the Manual") "provides information and guidance ... with respect to ... the [OCCA]. ..." The Congressional Findings and Declaration of Purposes of the Federal Guidelines for Treatment of Crime Victims and Witnesses in the Criminal Justice System ("the Declaration"), 18 U.S.C. § 1512 note, instruct the Attorney General in preparing guidelines to implement the VWPA. The Attorney General's guidelines did not appear until after the murders. The Objectives, though, were in force prior to the murders and, with the Manual, guided Savage and Ryan in their decision.

We shall examine these instructive materials beginning with the Manual, the most recently-issued and, we believe, the most helpful of the lot. The Manual elaborates on Section 502 of Title V of the OCCA, which authorizes the Attorney General "to offer to provide for the health, safety, and welfare of witnesses ... whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person ... in jeopardy."[7] The Manual provides at § 9–21.100 that "a wit-

---

5. The United States does not quarrel with the district judge's management of the factual issues; the dispute is entirely over the judge's interpretation of § 2680(a). We, like the district court, accept as true Cheryl's allegations that Savage and Ryan knew of Moore's threat and of Grandison's role in the 1979 assault. We also assume *arguendo,* with the district court, that the refusal to offer or provide protection was an abuse of discretion.

6. Pub.L. No. 91–452, title V, §§ 501–04, 84 Stat. 922, 933 (1970), *reprinted at* 18 U.S.C. prec. § 3481 (1982), *repealed by* Witness Security Reform Act of 1984, Pub.L. No. 98–473, § 1210, 98 Stat. 1837, 2163 (1984).

7. A Department of Justice internal order, OBD 2110.2, titled "Witness Protection and Maintenance Policy and Procedures" and effective as of January 20, 1975, speaks in terms similar to

those of the Manual. The order, issued under the authority of the OCCA, states that witness protection "in a Federal criminal proceeding is a local or state police matter to be handled only by those authorities ... [e]xceptions to this policy will be allowed only on the finding of the Assistant Attorney General of the concerned division that the proposed witness meets all of the following conditions. ..." The conditions are that the person be a witness in a specific case in progress, that evidence indicates that the life of the witness or a member of the witness' family or household is in immediate jeopardy, and that evidence indicates that it would be advantageous to the federal interest to protect the threatened person. The determination whether a witness meets the conditions is left to the Assistant Attorney General; the order flatly forbids investigative agents and attorneys from representing anything to witnesses concerning funding, protection, or relocation.

ness may be considered for the Witness Security Program if the person is an essential witness in a ... case that ... has a nexus to organized criminal activity, where there is clear evidence that the life of the witness or a family member is in immediate jeopardy ... [t]he protection of a witness and his family is ordinarily the responsibility of the local authorities and the implementation of federal protection requires a determination that local authorities are unable to provide adequate protection."[8]

The plain language of the sources we have reviewed in the preceding paragraphs reveals that the decision whether to offer the Piechowiczes federal protection was left to Savage's and Ryan's discretion. *See Jet Indus. v. United States*, 777 F.2d 303, 306 (5th Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986) ("We conclude that the selection and supervision of participants in the Federal Witness Protection Program constitute discretionary functions."); *Taitt v. United States*, 770 F.2d 890, 893 (10th Cir.1985); *Bergmann v. United States*, 689 F.2d 789, 793 (8th Cir.1982) ("Whether or not the witness ... is in danger is a judgment clearly committed to the discretion of the Attorney General."). The agents' conduct, involving as it did an element of judgment, therefore satisfies the first *Berkovitz* standard.

We also believe the conduct depended on considerations of public policy, and therefore passes muster under the second *Berkovitz* standard. As the Eighth Circuit has observed, "[d]etermining whether protec-

tion of the witness is advantageous to the federal interest rather obviously calls for a policy decision of the discretionary nature." *Bergmann*, 689 F.2d at 793 (appraising the OBD 2110.2 criteria for extending protection); *see also Taitt*, 770 F.2d at 893. The Manual, like OBD 2110.2, requires the responsible agents to consider, among other criteria, the witness's importance to the prosecution as an aspect of the decision, and to conclude that local authorities are unable to provide protection commensurate with the federal interest in the witness's safety. The determination vested in Savage and Ryan, then, was in the broad sense whether protecting the Piechowiczes would be "advantageous to the federal interest", and was accordingly one freighted with policy overtones.

### C.

 The last issue we treat is whether the district court properly accorded Savage and Ryan qualified immunity from suit in their individual capacities. Named under the authority of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), Savage and Ryan argued that their discretionary choice not to protect the Piechowiczes deserved immunity because it did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Mitchell v. Forsyth*,

---

**8.** The Declaration sheds little light on the issue at hand, stating only, at (a)(2), that "[a] ... witness should routinely receive information on steps that law enforcement officers and attorneys for the Government can take to protect victims and witnesses from intimidation."

While not, as we have said, in force and binding on Savage or Ryan during the incident period, the Attorney General's Guidelines for Victim and Witness Assistance are consonant with the tenor of the applicable materials. The Guidelines state that "[t]hey are intended to ensure that responsible officials, in the exercise of their discretion, treat ... witnesses fairly and with understanding", and counsel that "witnesses of serious crimes ... should be advised of the following information in a timely manner ... [including] [s]teps that may, if warranted, be

taken to protect ... witnesses from intimidation...." Further, "witnesses should routinely receive information on the prohibition against ... witness intimidation and harassment and the remedies therefor ... [t]he responsible official should, if warranted, advise the component of the [Justice Department] having ... enforcement responsibilities ... of instances involving intimidation ... of any ... witness." Finally, the Guidelines announce that they "provide only internal [Justice Department] guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural ... these guidelines are intended to ensure that responsible officials, in the exercise of their discretion, treat victims and witnesses fairly and with understanding."

472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (allocating to the plaintiff the burden to "state a claim of violation of clearly established law" to avoid dismissal based on qualified immunity). We agree with the district court that the Piechowiczes had no clear right to protection, and affirm the dismissal of Savage and Ryan based on their qualified immunity.

The district court appears to have appraised the agents' immunity not only under *Harlow*, but also under a distinct, though complementary, rubric. The second rubric inquires whether, under *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980) and *Fox v. Custis*, 712 F.2d 84 (4th Cir.1983), there was any special relationship between the United States and the murder victims that could have "[given] rise to a right, vindicable under § 1983, to affirmative protection by the [United States]." 712 F.2d at 88. We agree with the district court that the Fourteenth Amendment analysis elaborated in *Martinez, Fox*, and their progeny applies to the Fifth Amendment due process claims advanced by the plaintiffs. We also agree that no "special relationship" between Grandison's victims and the United States created any rights vindicable by the plaintiffs.

Our attention in analyzing the agents' qualified immunity is to the state of the law between March 14, 1983, when Moore threatened Cheryl, and April 28, 1983, when Evans murdered David and Susan. As we concluded in the preceding section, no statute or case grants federal witnesses or their families a right to federal protection. Under *Harlow*, then, the agents deserved qualified immunity.

We interpret the Supreme Court's recent decision in *DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. ——, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), issued after rendition of the district court opinion in this case, to signify that the United States had no due process duty to protect David and Cheryl against the depredations of a ruthless federal defendant.[9] Joshua DeShaney and his mother, Melody, alleged that various agencies and employees of Winnebago County, Wisconsin, had deprived Joshua of liberty without due process by failing to intervene between Joshua and his physically abusive father. Although a social service worker suspected that Joshua's father, to whom the County had returned the four-year-old after taking him into custody on suspicion of child abuse, continued to abuse the child, the County took no action. A final beating left Joshua with profound brain damage.

The Court flatly rejected the DeShaneys' argument that the State, through its knowledge of Joshua's plight and proclaimed intention to protect Joshua from his father, entered into a special relationship requiring it to protect Joshua in a reasonably competent fashion.[10] 489 U.S. at ——, 109 S.Ct. at 1004, 103 L.Ed.2d at 260. While *Youngberg v. Romeo*, 457 U.S. 307, 314–25, 102 S.Ct. 2452, 2457–63, 73 L.Ed.2d 28 (1982) extrapolated from earlier decisions interpreting the Eighth Amendment to hold that involuntarily committed mental patients have a Fourteenth Amendment due process right to services necessary to ensure their "reasonable safety", neither *Youngberg* nor any other precedent suggested to the Court a rule as broad as the DeShaneys proposed. 489 U.S. at ——, 109 S.Ct. at 1005, 103 L.Ed.2d at 261; *see also Estelle v. Gamble*, 429 U.S. 97, 97

---

**9.** *DeShaney*, like *Martinez*, interpreted the concept of "liberty" under the due process clause of the Fourteenth, rather than the Fifth, Amendment. We believe the *DeShaney* analysis applies equally in a suit against the United States, given the Supreme Court's essentially identical interpretations of the concept under the two amendments.

**10.** The Court identified *Martinez* as the likely rootstock of the DeShaney's argument, but noted that language suggesting the argument was

dicta to the *Martinez* holding that the causal relationship between the State conduct and the harm was too attenuated to import a § 1983 "deprivation". 489 U.S. at —— n. 4, 109 S.Ct. at 1004 n. 4, 103 L.Ed.2d at 260 n. 4. *DeShaney* suggests that dicta to our opinion in *Jensen v. Conrad*, 747 F.2d 185, 190–94 and n. 11 (4th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), as well as decisions of other Courts of Appeals, granted too much significance to the *Martinez* dicta. *Id.*

S.Ct. 285, 50 L.Ed.2d 251 (1976) (Eighth Amendment requires States to provide adequate medical care to incarcerated prisoners). Perceiving the duties imposed on the States under *Estelle* and *Youngberg* to arise from the limitations the States impose on the liberty of persons involuntarily in State custody, rather than from the States' knowledge of an individual's predicament or expressed intent to help the individual, the Court concluded that Joshua could not invoke the protections of the Fourteenth Amendment because he had not been in State custody when the crippling beating occurred. 489 U.S. at ——, 109 S.Ct. at 1005, 103 L.Ed.2d at 262.

The implications of *DeShaney* for the plaintiffs' argument are clear, and devastating. The United States did not trigger the due process clause because it never took David or Cheryl into its custody. As in *DeShaney*, "[t]he most that can be said of the ... functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them."[11] 489 U.S. at ——, 109 S.Ct. at 1006, 103 L.Ed.2d at 263. Without concluding that Savage and Ryan could have averted the tragedy that overtook David and Susan, we rest our disposition of this issue on our holding that Fifth Amendment substantive due process protects the liberty interests only of persons affirmatively restrained by the United States from acting on their own behalf.[12]

## III.

For the reasons expressed in the preceding sections, we conclude that the district

court correctly dismissed the action as to all defendants, and accordingly affirm.

AFFIRMED.

**11.** We note as well that, unlike *DeShaney*, there is no evidence that the defendants offered to protect David, Cheryl, or Susan.

The *DeShaney* Court offered that "[i]t may well be that ... the State acquired a duty under state tort law to provide [Joshua] with adequate protection against [his abusive father]." 489 U.S. at ——, 109 S.Ct. at 1006, 103 L.Ed.2d at 263. Here, of course, we have rejected the FTCA as an available vehicle for relief against the United States. The Court made clear, though, that the existence or not of a tort remedy had nothing to do with its Fourteenth Amendment analysis, and we similarly conclude that the absence of any alternative avenue for

recovery has no effect on our interpretation of the Fifth Amendment.

**12.** The availability of qualified immunity for State and federal agents operating in a "special relationship" with a citizen is most unclear under current case law. The *DeShaney* Court had "no occasion to consider whether the individual respondents might be entitled to a qualified immunity defense...." 489 U.S. at —— n. 10, 109 S.Ct. at 1006 n. 10, 103 L.Ed.2d at 263 n. 10. The inapplicability of special relationship analysis to this case makes unnecessary any reconciliation of the qualified immunity and special relationship doctrines.