Martha **RUTHERFORD**, individually, and in her capacity as Administratrix of the Estate of Steven R. Rutherford, Deceased, Plaintiff,

v.

The CITY OF NEWPORT NEWS, VIRGINIA, Jay A. Carey, Jr., individually and in his official capacity as former Chief of Police of the City of Newport News, Virginia, and Barry Haddix, individually, and in his official capacity as a former Police Sergeant for the City of Newport News, Virginia, and T.A. Zeitler, and James O. Williamson, individually, and in their official capacities as Police Sergeants for the City of Newport News, Virginia, Defendants.

Civ. A. No. 4:95cv8.

United States District Court, E.D. Virginia, Newport News Division.

Feb. 29, 1996.

Michael F. Imprevento, Andrew Michael Sacks, Sacks & Sacks, Stanley E. Sacks, Sacks, Sacks & Imprevento, Norfolk, VA, for plaintiff.

Allen Link Jackson, Deputy City Attorney, Newport News, VA, for City of Newport News, Virginia.

Allen Link Jackson, Newport News, VA, Alan Brody Rashkind, Furniss, Davis, Rashkind & Saunders, Norfolk, VA, for Jay A. Carey, Jr.

Allen Link Jackson, Newport News, VA, Fred Bradford Stillman, Robert William McFarland, David Michael Young, McGuire, Woods, Battle & Boothe, Norfolk, VA, for Barry Haddix.

Allen Link Jackson, Kenneth Robert Yoffy, Saunders, Stephenson, Cope, Olson & Yoffy, Newport News, VA, for T.A. Zeitler.

Roy Barrow Blackwell, Kaufman & Canoles, Norfolk, VA, Allen Link Jackson, Newport News, VA, Jonathan Lee Thornton, Kaufman & Canoles, Norfolk, VA, for James O. Williamson.

### OPINION AND ORDER

DOUMAR, District Judge.

This case arises from the tragic murder of a young police officer who was ordered to go undercover for the purpose of nabbing a suspected robber of pizza delivery men. The officer, Steven R. Rutherford, was murdered by the robbers. Officer Rutherford's wife, acting pursuant to 42 U.S.C. § 1983, now brings this action against his superiors and the municipality which employed him, claiming that they violated his constitutional rights under the substantive component of the Due Process Clause. Plaintiff's theory of the case is that the Due Process Clause provides an "affirmative duty" on the part of the defendants to protect her decedent once their actions or omissions "created the danger" into which he stepped.

Pending before the Court are motions by all defendants to dismiss, and motions for summary judgment by the individual defendants on the basis of qualified immunity.

For the reasons that follow, the motions to dismiss will be **GRANTED**.

### I. Factual and Procedural Background

Plaintiff Martha Rutherford, the Administratrix of the estate of Steven R. Rutherford, deceased, brings this action against the following defendants: the City of Newport News, Virginia ("Newport News"); Jay Carey ("Carey"), formerly the Chief of Police of the Newport News Police Department ("Newport News P.D."); Barry Haddix ("Haddix"), formerly a police sergeant with the Newport News P.D.; and T.A. Zeitler ("Zeitler") and James Williamson ("Williamson"), currently police sergeants with the Newport News P.D. Each of the individuals is sued individually and in their official capacities.

The following facts are taken from the plaintiff's complaint, the truth of which is assumed for the purpose of the pending motions. The case arises out of a tragic incident on the night of January 11, 1994.[1] Prior to that night, there had been a series of armed robberies of pizza delivery drivers in Newport News. A franchise of a local pizza chain, Chanello's, received what it regarded as a "suspicious" call during the evening hours. Aware of the recent robberies, the Chanello's supervisor called the Newport News P.D. for assistance.

An undercover "sting" operation was hastily concocted that night by police officials. Plaintiff's decedent, twenty-eight year old Steven Rutherford, and his partner, Todd Cioffi, both officers with the Newport News P.D., were selected to participate. Neither of the officers had any training or practice in such operations. Second Amended Compl., ¶ 28.[2] Officer Rutherford was instructed to disguise himself as a "pizza driver" and to act as a "decoy." Id., ¶ 26. Officer Cioffi was ordered to provide backup. The three sergeant-defendants who ordered the operation were located some 175–200 feet away, but were unable to see the scene of the robbery

---

1. At oral argument, a statement was made that the relevant date is January 14, 1994. That statement is contradicted by plaintiff's complaint, which states January 11, 1994 as the relevant date. In any event, the difference does not affect the legal analysis.

2. For the sake of simplicity, the "Second Amended Complaint" will be referred to hereafter as the "Complaint."

from their location, and were separated from the decoy car used by Rutherford and Cioffi by a six foot tall wooden fence. *Id.,* ¶ 41.

To characterize the operation as poorly planned is an understatement. Officers Rutherford and Cioffi, who had been filling out paperwork elsewhere when called for the assignment, worked on the details among themselves while driving from the pizza shop. *Id.,* ¶¶ 30, 31. Though instructed to pose as a "realistic" pizza delivery driver, Officer Rutherford was given an empty pizza box. *Id.,* ¶ 43. Officer Rutherford was not given a wire transmitter or electronic device that would permit his backup to monitor the situation. *Id.,* ¶ 44. No clear channel of communications was established for Cioffi in the event the operation went awry. When it did, he was unable to call promptly for additional backup. *Id.,* ¶ 52, 53. No escape or contingency plans were made. *Id.,* ¶ 54.

The operation, such as it was, failed miserably, and ended in disaster. Officer Rutherford's identity as a police officer was quickly discovered by the robbery assailants; he was shot four times and killed.

Plaintiff Martha Rutherford, the deceased officer's wife, brings this action pursuant to 42 U.S.C. § 1983, alleging a deprivation of the decedent's constitutional rights under the substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. She seeks compensatory and punitive damages.

All defendants made motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). By order entered September 15, 1995, discovery was stayed pending resolution of the Rule 12(b)(6) motions. On October 18, 1995, each of the individual defendants moved for summary judgment on grounds of qualified immunity.[3] Oral argument was heard on the summary judgment motion on January 16, 1996. This matter is now ripe for adjudication.

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of an action for failure to state a claim upon which relief can be granted. Motions to dismiss are to be granted sparingly: ". . . . a motion to dismiss should not be granted unless the plaintiff can *prove no set of facts* which would entitle him to relief." *Fayetteville Investors v. Commercial Builders,* 936 F.2d 1462, 1466 (4th Cir.1991); *Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994). In considering a motion to dismiss, the court should construe the complaint favorably to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Martin Marietta Corp. v. Intelsat,* 991 F.2d 94, 97 (4th Cir.1992) ("the claims must be construed in the light most favorable to the non-moving party and its allegations taken as true.").

Summary judgment under Rule 56 presents a different standard of review. To sustain a motion for summary judgment, the Court must find that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

Thus, because there are no facts before the Court, other than those set forth in plaintiff's complaint, the standard of review is essentially that under Rule 12(b)(6), and the Court will construe the allegations of the plaintiff as true for the purpose of these motions. Dismissal or summary judgment may be entered for the defendants only if they are entitled to prevail as a matter of law.

## III. Analysis

### A. Claims not before the Court

It is worth pausing here to emphasize what this action is *not* about. Defendants, construing plaintiff's complaint as possibly presenting an action under state tort law, extensively briefed the issue. Plaintiff has made

---

**3.** When a government employee claims qualified immunity, discovery should not be allowed until this threshold legal question is resolved. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). By the time the qualified immunity defense was asserted, discovery had already been stayed.

clear that no such claim is before the Court. The action arises solely under the Constitution. Plaintiff's Brief in Opposition to Sergeants' Motion to Dismiss at 32 ("plaintiff unequivocally states that she does not plead any pendant state law claim ... [n]o state law claims are made ... nor will be made in this case") (hereafter "Pl.Br. in Opp. to Sgts. Dismissal Mot.").

Second, plaintiff has withdrawn claims for damages asserted in her individual capacity for violation of *her* civil rights, and confines her Complaint to "claims for the widow's damages as a statutory death beneficiary" and to the decedent's own personal claims for violations of his civil rights. *Id.* at 33 n. 6.[4]

### B. Counts I, II, and III: The Affirmative Duty to Protect Under the Substantive Due Process Clause

At the outset, it is important to understand the precise nature of plaintiff's claim. As summarized by her, it is as follows:

> The essence of plaintiff's claim is that defendants recklessly, willfully, and arbitrarily created a patently life-threatening danger to [Officer] Rutherford; then recklessly, willfully, and arbitrarily failed to protect his life; and thereby proximately cause [sic] his brutal death.

*Id.* at 10. In sum, plaintiff alleges that the Haddix, Zeitler, and Williamson, the sergeants-defendants (hereafter "Sergeants"), had an "affirmative duty" to protect Officer Rutherford because they had allegedly "created the danger" into which he was required to step on the fateful night—by sending him to the assailants' house without adequate preparation, planning, and backup. There is no contention that this was undertaken for any purpose other than to fulfill what the Sergeants believed was their sworn duty: to apprehend a suspected robber. Plaintiff acknowledges this critical fact, noting that the Sergeants undertook "to conduct an undercover sting operation" *in an effort to discover the persons who were robbing pizza delivery*

personnel, and to arrest and prosecute such persons.* Compl., ¶ 24 (emphasis added).

Plaintiff does not contend that a "mere order, standing alone, to a police officer to be part of a robbery decoy is itself *per se* unconstitutional." Pl.Br. in Opp. to Sgts. Dismissal Mot. at 11. Instead, the action which is allegedly contrary to the Constitution is the arbitrary "creation of the likely loss of the officer's life and the concomitant reckless, willful, and arbitrary failure to protect his life." *Id.*

Plaintiff attempts to argue that three separate causes of action arise under this theory. But the claims set forth in Counts I, II, and III are largely indistinguishable. Each count alleges a violation of the substantive Due Process Clause of the Fourteenth Amendment. *See* Compl., ¶ 67 (Count I), ¶ 72, (Count II), and ¶ 77 (Count III). Each count also sets forth the alleged right under the Due Process Clause—the right to protection by the state actors once they allegedly "created the danger." In *Count One,* plaintiff states that

> [the] sergeants *placed* plaintiff's decedent *in a position of life-threatening danger* from private persons, and then *failed to protect him,* all through reckless and deliberately indifferent conduct.

*Id.,* ¶ 62 (emphasis added). In *Count Two,* plaintiff states that

> [the] sergeants' affirmative *placement* of plaintiff's decedent *in such danger* and their corresponding *failure to protect him* were so wanton and evinced such a reckless disregard of the safety of plaintiff's decedent as to constitute a wilful violation of plaintiff's decedent's rights and safety.

*Id.,* ¶ 70 (emphasis added). In *Count Three,* plaintiff alleges that

> [the] sergeants' affirmative *placement* of plaintiff's decedent *in such danger* and their corresponding *failure to protect him* were so wanton and evinced such a reckless disregard of plaintiff's decedent as to constitute arbitrary, abusive, unjustified, oppressive, and capricious government ac-

4. This does not result in the dismissal of any counts of the Complaint. Each count alleges a deprivation of *decedent's* rights. Compl., ¶¶ 67, 72, 77, 107, 117. Nonetheless, Plaintiff's *ad* *damnum* clause sought damages for violations of *her* constitutional rights. *Id.,* ¶ 122B–C. That claim (such as it was) has been withdrawn.

tion toward plaintiff's decedent's rights and safety; and under the circumstances of this case, as to shock the conscience. *Id.,* ¶ 75 (emphasis added).

Thus, in the operative paragraph of each count does the plaintiff restate the "affirmative duty to protect" theory. The only distinguishing feature between the three is a different standard of care. Specifically, in Count One, she alleges that the Sergeants were "reckless and deliberately indifferent;" in Count Two, she alleges that they were "wanton and evinced such a reckless disregard of the safety" of her decedent; and in Count Three, she alleges that defendants' actions were "so wanton and evinced such a reckless disregard of plaintiff's decedent ... as to constitute arbitrary ... action [that] shock[s] the conscience." These conclusory statements, it bears emphasis, are inferences drawn by the plaintiff from the facts alleged; they are not facts.

■ Under Section 1983, "two—and only two—allegations are required to state a cause of action:" that some person has deprived plaintiff of a federal right and acted under color of law. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). To be sure, liability does not lie under the Due Process Clause in § 1983 cases unless the action involves some "deliberateness," and mere negligence is not actionable. *Daniels v. Williams,* 474 U.S. 327, 333, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986). But the Supreme Court has not announced separate "standards of care", analogous to those found in tort law, that would provide three separate causes of action. In this circuit, the residual protections of substantive due process implicated appear to run only to state actions that shock the conscience. *Rucker v. Harford County,* 946 F.2d 278, 281 (4th Cir.1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992); *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 720 (4th Cir.1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992).[5]

■ The Sergeants urge dismissal of Counts I and II because these counts do not allege that the Sergeants' actions "shocked the conscience" under *Rucker.* The Court need not answer this question, because the essential claim made by the plaintiff in the first three counts is the same: that the Due Process Clause creates a certain constitutional duty—here, the affirmative duty on the part of the state actors to protect the decedent because their actions or omissions allegedly created the danger into which he was placed.

The central question is therefore whether this Due Process right extends to the case at bar—even assuming all of the essential facts in the plaintiff's complaint as true. The entire case stands or falls on this issue. To this task the Court now turns.

■ Plaintiff contends that the "affirmative duty" is grounded in the substantive Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. The Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." Its so-called substantive component protects individuals against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986).[6] As the Su-

5. It is not clear whether this standard of care applies to all substantive due process cases. *Compare Rucker,* 946 F.2d at 281 (shock the conscience standard applies to "any context") *with Temkin,* 945 F.2d at 723 n. 5 (shock the conscience standard applies to high speed police chases, but reserving question whether same standard applies to cases where "governmental control over the claimant is intentional and direct"). The brief parenthetical reference in *Rucker* to "any context" seems to leave the question open. Moreover, the Fourth Circuit recently stated that the Supreme Court has rejected the "shock the conscience" standard in § 1983 cases

of this kind. *Pinder v. Johnson,* 54 F.3d 1169, 1179 (4th Cir.1995) (en banc) (citing *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 197–98, 109 S.Ct. 998, 1004–05, 103 L.Ed.2d 249 (1989)), although one judge characterized that portion of the *Pinder* decision as *dicta. Pinder,* 54 F.3d at 1179 (Motz, J., concurring in part and concurring in the judgment). This Court avoids passing on the standard of care required here.

6. Plaintiff's original complaint stated that it was based on the Fourth, Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

preme Court has noted, our national charter in general, and the Due Process Clause in particular, limits the government's power to interfere with individual life, liberty or property; it does not act as a "guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). Stated another way, the Clause, as a general proposition, does not require the state[7] to protect individuals from harm caused by third parties.

■■■ An exception to this general rule arises: whenever the state takes a person into custody, thus depriving him of his liberty interest, the Due Process Clause requires the government to meet certain minimal standards. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125–128, 112 S.Ct. 1061, 1069–70, 117 L.Ed.2d 261 (1992) (collecting cases). In other words, the state cannot incarcerate a person and then shun responsibility for his well being. In stripping an individual of his freedom, the state assumes an affirmative duty to provide for his basic human needs, such as "food, clothing, shelter, medical care and reasonable safety." *DeShaney, supra*, 489 U.S. at 199–200, 109 S.Ct. at 1005; *Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982).

Plaintiff argues that the requirement of an affirmative duty to protect an individual extends beyond the custodial setting to instances where there is a "special relationship" or the state "creates the danger."[8] This contention relies primarily on the Fourth Circuit cases of *Fox v. Custis*, 712 F.2d 84 (4th Cir.1983), *Jensen v. Conrad*, 747 F.2d 185 (4th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985), and this Court's opinion in *Swader v. Virginia*, 743 F.Supp. 434 (E.D.Va.1990). Plaintiff also

urges this Court to adopt the reasoning of the Ninth Circuit in *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir.1992), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). The Sergeants counter that the "affirmative duty to protect" requirement is limited to the custodial setting, relying primarily on *DeShaney, supra*, the recent *en banc* opinion of the Fourth Circuit in *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995), and two opinions of this Court, *Williamson v. City of Va. Beach*, 786 F.Supp. 1238 (E.D.Va.1992), *aff'd* 991 F.2d 793 (4th Cir.1993) (per curiam) (unpublished) and *B.M.H. v. School Bd. of Chesapeake*, 833 F.Supp. 560 (E.D.Va.1993). These cases will now be considered.

In *DeShaney*, the petitioner sought to hold the state responsible for the brutal beating of a young boy by his father. The County Department of Social Services had received complaints that the boy had been abused by his father, and took certain steps to protect him. The defendant did not act, however, to remove the child from the father's custody. Ultimately, the boy was beaten so severely that he suffered serious brain damage that rendered him retarded. The Court rejected the proposition that the Due Process Clause extended beyond the custodial context and required the defendant to affirmatively protect the boy once it knew of the potential danger to him. The Court stated that while the "State may have been aware of the dangers [to the boy] ... it played no part in their creation, nor did it do anything to render him any more vulnerable to them." 489 U.S. at 201, 109 S.Ct. at 1006. Thus, the Court seemingly left the door open to the "danger creation" exception urged by plaintiff.

---

The Second Amended Complaint, filed July 13, 1995, deletes the references to all Constitutional provisions save the Fourteenth Amendment. *See* Pl.Motion to Amend at 3 n. 1. Nonetheless, that same complaint states that although the claims arise under the Fourteenth Amendment, the claim is "in no way limited to" the substantive component of the Fourteenth Amendment. Plaintiff has not identified, nor has the Court discovered, any other constitutional right implicated in this case.

7. The term "state," as used in this opinion, refers to state or municipal governments generally.

8. As used in this opinion, references to a "special relationship" exception and a "danger creation" exception to the custody requirement are used interchangeably, as does the plaintiff. *See* Pl.Br. in Opp. to Sgts. Dismissal Mot. at 15 & n. 3.

*Pinder v. Johnson,* 54 F.3d 1169 (4th Cir. 1995) (en banc) involved a case as equally as tragic as *DeShaney* and the case at bar. There, the plaintiff's former boyfriend had broken into her home, and had become abusive and violent. The police officer who arrived on the scene assured the plaintiff that the boyfriend would be locked up overnight. With this assurance, plaintiff returned to work, leaving her children at home. The police officer failed to keep his pledge: the boyfriend was charged with misdemeanors and released that night on his own recognizance. He promptly returned to the plaintiff's home and set it on fire, killing the children sleeping inside. The plaintiff urged (and the district court and then a panel of the Fourth Circuit so held) that the promise of the police officer had created a "special relationship," imposing a duty on the state to protect plaintiff and her children. The Fourth Circuit, sitting *en banc,* reversed, holding that the officer's promise was insufficient to create an affirmative duty. *DeShaney,* the court stated, requires a custodial relationship in order to create the duty: "Promises do not create a special relationship—custody does." 54 F.3d at 1175. The police officer's actions were not "affirmative misconduct" that "created or enhanced the danger," but omissions—which do not give rise to civil liability under § 1983. The court continued:

> [i]t cannot be that the state commits an affirmative act or creates a danger every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime committed by the prisoners it released ... [n]o amount of semantics can disguise the fact that the real "affirmative act" here was committed by Pittman, not Officer Johnson. As was true in *DeShaney,* the state did not "create" the danger, it simply failed to provide adequate protection from it.

*Id.* *Pinder* involved the defense of good faith qualified immunity, which asks whether the law was "clearly established" at the time of the incident (in *Pinder,* in 1989). *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (discussing qualified immunity doctrine).

Plaintiff contends that two Fourth Circuit cases prior to *DeShaney* which supposedly stand for the right urged by plaintiff were not called into question by *DeShaney.* In *Fox v. Custis,* 712 F.2d 84 (4th Cir.1983), the plaintiffs charged that the defendants had violated their constitutional rights in negligently releasing a parolee who committed crimes against them. The Fourth Circuit held that there was "no constitutional right to be protected by the state against ... criminals or madmen." *Id.* at 88 (quoting *Bowers v. DeVito,* 686 F.2d 616, 618 (7th Cir.1982)) (internal quotations omitted). The Court conceded, however, that "such a right and corollary duty *may* arise out of special custodial or *other relationships* created or assumed by the state in respect of particular persons." *Id.* (emphasis added)

The Fourth Circuit elaborated on the point the following year in *Jensen v. Conrad,* 747 F.2d 185 (4th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1985). There, the Court considered two consolidated cases involving facts similar to *DeShaney* (i.e., battered children not adequately protected by state actors with notice). Although the Court ultimately held for defendants on grounds of qualified immunity, it stated that an affirmative duty, based on *Fox,* might exist given the proper facts. *Id.* at 194. The Court proceeded, in *dicta,* to delineate certain factors that should be included in a "special relationship" analysis. *Id.* at 194 n. 11.

Notably, the *DeShaney* Court specifically criticized the *dicta* in *Jensen.* In summarizing plaintiff DeShaney's position, the Court noted that many circuit courts, including the Fourth, had construed the Court's own *dicta* in *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980), as opening the door to an "affirmative duty" outside the custodial context:

> Several of the Courts of Appeals have read [the language in *Martinez* ] as implying that once the State learns that a third party poses a special danger to an identified victim, and indicates its willingness to protect the victim against that danger, a special relationship arises between the

State and the victim, giving rise to an affirmative duty, enforceable through the Due Process Clause, to render protection. *DeShaney,* 489 U.S. at 197–198 & n. 4, 109 S.Ct. at 1004 & n. 4. The Court went on to cite *Jensen* and cases from several other circuits. The Court then stated, unambiguously, *"we reject this argument." Id.* at 198, 109 S.Ct. at 1004 (emphasis added).

The Fourth Circuit returned to the special relationship issue soon after *DeShaney.* In *Piechowicz v. United States,* 885 F.2d 1207 (4th Cir.1989), the plaintiffs sued under § 1983 for the government's failure to protect witnesses in a criminal case whose personal safety had been threatened. David and Cheryl Piechowicz, employees at a Baltimore hotel, testified at a pretrial suppression hearing in the prosecution of Anthony Gradison on federal drug charges regarding contraband recovered in Gradison's hotel room. Cheryl Piechowicz reported being approached by a woman who made statements that she perceived to be threatening. The Piechowicz' did not ask for protection, and United States did not offer it. Prior to Gradison's trial, David Piechowicz and his sister-in-law (apparently mistaken for his wife Cheryl) were murdered in the hotel. *Id.* at 1210. The Fourth Circuit held that no "special relationship" between the United States and the victims created any duty on the part of the government to protect Mr. and Mrs. Piechowicz. Although the district court opinion had rested on grounds of qualified immunity, the Fourth Circuit rested on the premise that the "special relationship" doctrine required custody, based on *DeShaney:* [9]

> [t]he implications of *DeShaney* for the plaintiffs' argument are clear, and devastating. The United States did not trigger the due process clause because it never took David or Cheryl into custody.... *we rest our disposition* of this issue on our holding that Fifth Amendment *substantive due process protects the liberty interests only of a person affirmatively restrained by the United States from acting on their own behalf.*[10]

*Id.* at 1215 (emphasis added). Thus did the Fourth Circuit state in no uncertain terms that a "special relationship" creating an affirmative duty on the part of the state to protect an individual exists only in the context of custody. *See also Edwards v. Johnston County Health Dep't,* 885 F.2d 1215, 1219 (4th Cir.1989) (in opinion issued same day as *Piechowicz,* different Fourth Circuit panel found no "special relationship" in absence of custody where county health department negligently permitted substandard housing occupied by migrant workers).

Plaintiff takes heart from an opinion of this Court issued after *DeShaney, Piechowicz* and *Edwards.* In *Swader v. Virginia,* 743 F.Supp. 434 (E.D.Va.1990) (Clarke, J.), the plaintiff was a nurse at a state correctional facility who was required to live on the prison grounds as a condition of her employment. Her home was in an area outside the fenced-in portion of the prison where the inmates were housed, but inside an area containing other prison facilities. *Id.* at 435. An inmate was negligently permitted to work unsupervised in the outer area. He entered the plaintiff's residence and raped and strangled plaintiff's daughter to death. *Id.* The Court distinguished *DeShaney* by concluding that the state had "created the danger" in forcing plaintiff to live on the prison grounds and in permitting the inmate outside the fenced-in prison area without supervision. *Id.* at 442. The Court also noted that *Piechowicz, supra,* did not discuss the "danger creation" issue, and therefore the Fourth Circuit's opinions following *DeShaney* "signal[ed] no retreat" from the "special relationship" analysis developed in *Fox* and *Jensen. Id.* at 443.

*Swader* is distinguishable from the case at bar, for a simple reason: the state actors controlled the danger in *Swader.* There, the

---

**9.** *See id.* at 1215 n. 12 ("inapplicability of special relationship analysis to this case make unnecessary any reconciliation of the qualified immunity and special relationship doctrines").

**10.** The Fifth Amendment's due process clause applies to the Federal Government. The clause in the Fourteenth Amendment applies to states and municipalities. The rights protected by the two clauses are coextensive. *Paul v. Davis,* 424 U.S. 693, 699–701, 96 S.Ct. 1155, 1159–61, 47 L.Ed.2d 405 (1976); *see Piechowicz,* 885 F.2d at 1214 n. 9.

danger was the inmate, for whom the state had responsibility and control. The state failed to prevent that inmate from wandering unsupervised into the area where the plaintiff was required to live. Here, the danger was the robbers. Indisputably, the assailants who killed Officer Rutherford were not under the state's control. Even if Officer Rutherford had been properly trained and received adequate backup, the danger posed by the assailants would have remained— through no fault of the state actors.[11]

Nonetheless, plaintiff suggests that *Swader* is dispositive. But the force of *Swader* is undeniably weakened, if not overruled, by two subsequent opinions of this Court, one of which was authored by the same judge who authored *Swader*. In *B.M.H. v. School Bd. of Chesapeake*, 833 F.Supp. 560 (E.D.Va. 1993) (Clarke, J.), this Court was presented with a question of whether school officials owed a duty to a student who was threatened, and then assaulted, by a fellow student. The school authorities had forewarning of the potential danger to the victim. The Court noted that the "special relationship" doctrine it had embraced in *Swader* had been narrowed, if not rejected, by decisions of the Fourth Circuit (and this Court) after *DeShaney*:

> It is true that this Court's ruling in *Swader* placed great weight upon the three factors of the *Jensen* dicta. In light of the *Piechowicz, Edwards,* and *Williamson*[12] decisions ... it is this Court's present opinion that the *single relevant factor in determining if an affirmative duty exists under the Fourteenth Amendment is whether the state has so restrained the victim as to prevent him from acting on his own behalf.*

*Id.* at 569 (emphasis added). *Williamson v. City of Virginia Beach*, 786 F.Supp. 1238 (E.D.Va.1992) (Prince, J.), cited in *B.M.H.*, involved a case where a juvenile acted as an informant to the police, and subsequently committed suicide because of threats made

against him for his cooperation with the authorities. This Court found that the case was controlled by *Piechowicz*—and its finding that custody or "affirmative restraint" by the state is a necessary precondition to the "special relationship" doctrine. *Id.* at 1255.

To the extent that other circuits have embraced the "danger creation" doctrine outside the "traditional custodial context," the cases can be distinguished from the facts presented here. The *Pinder* court summarized the cases in this way:

> [i]n such instances, the state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party ... [a]t most, these cases stand for the proposition that state actors may not disclaim liability when they throw others to the lions ... [t]hey do not, by contrast, entitle persons who rely on promises of aid to some greater degree of protection from lions at large.

54 F.3d at 1177.

Plaintiff urges the court to follow this line of cases by averring that the Sergeants here created the danger by "throwing Officer Rutherford to the lions." But, as the *Pinder* court noted, the cases from outside this circuit "involve a wholly different paradigm" than that presented here. *Id.* Indeed, a close reading of the cases cited in *Pinder*, as well as those cited in the vacated panel opinion in *Pinder v. Johnson*, 33 F.3d 368 at 371 (4th Cir.1994), reveals that every case is distinct from the facts of the case *sub judice*: each involves state officials essentially bringing the assailants to the victim's door, or letting the malefeasor run free despite knowing that he presented a serious danger to the community. *See Cornelius v. Town of Highland Lake*, 880 F.2d 348, 356 (11th Cir.1989) (state permitted inmates to work within community under minimal supervision), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990); *Wells v. Walker*, 852 F.2d 368, 371 (8th Cir.1988) (prisoners released from correctional facility dropped off

---

**11.** From a legal standpoint, the effort by the *Swader* court to delineate a line between the "special relationship" and "danger creation" exceptions to the custodial requirement is seemingly contrary to the fact that the Fourth Circuit had

essentially blended the terms together in *Fox* and *Jensen*—as the plaintiff concedes. Pl.Br. in Opp. to Sgts. Dismissal Mot. at 15 & n. 3.

**12.** *See infra* for a discussion of *Williamson*.

at victim's grocery store to await bus pick-up), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989); *Nishiyama v. Dickson County,* 814 F.2d 277, 281 (6th Cir. 1987) (sheriff provided inmate unsupervised use of squad car); *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.) (police permitted drunk driver to continue after stop to arrest companion on unrelated charges), *cert. denied,* —— U.S. ——, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993); *Dwares v. City of New York,* 985 F.2d 94, 98–99 (2d Cir.1993) (police officers conspired with "skinheads" to arrange attack on victim); *Freeman v. Ferguson,* 911 F.2d 52, 54–55 (8th Cir.1990) (police chief prevented officers from arresting victim's assailant, then under restraining order, because assailant close friend of police chief); *Horton v. Flenory,* 889 F.2d 454, 457 (3d Cir.1989) (victim in custody where police permitted private club owner to continue burglary investigation on his own).

As defendants point out, the perpetrators in the foregoing cases were in state custody or control, either directly or constructively, and then the state actors unleashed them on their unsuspecting victims. The metaphor recited in *Pinder* is therefore inapt: the state actors did not throw the victims to the lions, they let the lions run free.

◼ Here, unlike the above-cited cases, the Sergeants did not let the lion run free; they never had him in their cage. They did not free the assailant after detaining him. Neither did they encourage or support his actions. Precisely the opposite: they were undertaking the operation for the explicit purpose of arresting those who had been robbing pizza drivers. Thus, even to the extent that the "danger creation" exception to the custody requirement has been embraced outside this Circuit, it extends only to instances where the state actors took an affirmative act to let a known danger run loose. It does not extend to a case where, as here, the police were trying to apprehend the known danger.

In sum, the case law makes clear that the affirmative duty to protect under the Due Process Clause arises primarily in the custodial context. The "danger creation" exception, to the extent it is recognized, still re-

quires some element of custody or control—although in these cases the person in state custody or control is not the victim (and thus the plaintiff in a § 1983 action), but the perpetrator who harmed the victim. No controlling authority extends the right to the case at bar, and this Court is not going to so extend it.

◼ Notably, plaintiff has failed to cite any authority which stands for the precise, and novel, claim urged here: that police officials owe an affirmative duty, based on the Constitution, to ensure that police officers dispatched on dangerous operations are specially trained, fully prepared, and adequately supported in undertaking such a mission. To be sure, as professionals employed in an extremely dangerous occupation, police officials owe it to the men and women serving under them to ensure they have adequate training, appropriate resources, and available backup. That obligation is a professional, and moral, responsibility. Too, there is a duty under state tort law to exercise reasonable care. But regardless of the scope of that obligation, or the fact that the state provides a remedy through workers' compensation, it does not rise to the level of a constitutional command under the Due Process Clause. *See Paul v. Davis,* 424 U.S. 693, 700, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976).

◼ Plaintiff's claim, at its heart, misconstrues the nature of Section 1983 liability. As the Fourth Circuit emphasized in *Pinder,* for liability to obtain, the conduct by the state actor must *directly* cause the harm to the plaintiff by his "immediate interaction" with the plaintiff. *Pinder,* 54 F.3d at 1176 n. * (emphasis in original). The protections of the Due Process Clause, it bears emphasis, apply to deliberate actions by government officials. *Collins v. City of Harker Heights,* 503 U.S. 115, 126 n. 10, 112 S.Ct. 1061, 1069 n. 10, 117 L.Ed.2d 261 (1992) (collecting cases).

Plaintiff attempts to recast the nature of her claim by arguing that it is "anything but a passive or omission-based failure to act

[claim]."[13] This assertion is wholly at odds with her complaint, which alleges that defendants failed to properly train her decedent, and then failed to protect him—both of which are omissions. She also states that the Sergeants are culpable because they had a "pro-active role in propelling the victim to his injury in an active sense." *Id.* She likened the circumstances here to the Sergeants ordering Officer Rutherford to drive off a cliff or jump from the top of a tall building to apprehend a suspect below. This is word-play. It mischaracterizes what actually happened here, because it overlooks the fact that the assailants represented the danger—a danger not created by the defendants. And it ignores the act that directly caused Officer Rutherford's tragic death—the pulling of the trigger by his assailant, not once, but four times. The Fourth Circuit warned district courts to "resist the temptation" to artfully recharacterize inaction as "action." *Pinder,* 54 F.3d at 1176 n. *. This Court will heed that warning.

Plaintiff devotes considerable energy in her brief in urging the Court to follow the Ninth Circuit in *L.W. v. Grubbs,* 974 F.2d 119 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993), where that court recognized the "danger creation" exception in a case with facts closely analogous to *Swader.* This Court has already found *Swader* factually distinguishable, and legally suspect. More to the point, when precedent exists in the Fourth Circuit, this Court follows it, as it is bound to do.

■ One final point deserves mention. The sweeping nature of the unique claim pressed by the plaintiff, if adopted, could elevate to a constitutional status hundreds, if not thousands, of decisions taken by governments at all levels regarding the allocation of resources to those employed by the state in dangerous occupations. Policemen, firemen, prison guards, probation officers, security guards, even schoolteachers (who increasingly face threats to their security from their students) would conceivably have a claim against the government whenever the state failed to provide adequate protection or training against known, or foreseeable, risks.

Of course, government employees do not lose their constitutional rights once they agree to work for the state. *City of Harker Heights, supra,* 503 U.S. at 120, 112 S.Ct. at 1066. But the Constitution does not guarantee state employees a "workplace free from unreasonable risks of harm." *Id.* at 127, 112 S.Ct. at 1070.

Police work is dangerous—exceedingly so. Police officers are charged with the unenviable task of dealing with society's most depraved and violent individuals. Their lives are at risk every working day. To impose a constitutional duty here—to open cases like this to the vagaries of the tort system— would place great burdens on law enforcement. Workers' compensation laws have been enacted to provide some redress for government employees. To permit suits of this nature would clearly contravene the policy of setting fixed awards to compensate those harmed by the requirements of their employment.

Of course, neither benefits paid by workers' compensation nor any award available elsewhere can adequately compensate Mrs. Rutherford for the loss of her beloved husband. No matter how sympathetic the cause is, however, policy decisions about the best means of protecting or compensating state employees are properly reposed in the political branches, not the judicial. *Id.*

The Court therefore FINDS that the constitutional right to affirmative protection under the substantive Due Process Clause does not apply to this case. Accordingly, the motion to dismiss by defendants Haddix, Zeitler, and Williamson is GRANTED.

## C. Qualified Immunity

■ Alternatively, the Court holds that the doctrine of good faith qualified immunity protects the three sergeants from liability here. The doctrine shields government employees from civil liability unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The rationale for this

---

**13.** Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment at 18.

well-settled rule is simple enough: to ensure that government officials, who make numerous discretionary decisions in the course of a workday, are not held civilly liable unless it should have been clear that they were violating the law. Qualified immunity has particular importance for law enforcement officials, who frequently must make quick judgments in unsettled or uncertain situations. In the absence of the qualified immunity rule, police officers might be held "liable in hindsight for every injurious consequence of their actions," which would undoubtedly "paralyze the functions of law enforcement." *Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.1995) (en banc) (citing *Torchinsky v. Siwinski,* 942 F.2d 257, 260 (4th Cir.1991)).

 Judging whether qualified immunity attaches turns on a standard of objective reasonableness. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). For an individual official to be held liable, the "contours of the [allegedly violated right] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. The focus is on the settled law at the time of the events in question, not the law as it exists today. *DiMeglio v. Haines,* 45 F.3d 790, 794 (4th Cir.1995).

 The constitutional right urged by plaintiff—the affirmative duty on the part of the state actors to protect the decedent because they allegedly created the danger—was not clearly established on January 11, 1994. As discussed at length above, as of that time, the Fourth Circuit had stated clearly that the "special relationship" or "danger creation" doctrine existed only in the custodial context. Just one opinion of this Court (*Swader*)—cast in doubt or overruled by subsequent opinions—would seem to stand for the general proposition urged by plaintiff. And that opinion of this Court is factually distinguishable from the case here.

As plaintiff notes, to find that the law was "clearly established" does not require a prior case "directly on all fours," *Pinder,* 54 F.3d at 1173, but there must be some correspondence between the conduct at issue and prior case law. *See Liebson v. New Mexico Corrections Dept.,* 73 F.3d 274, 278 (10th Cir. 1996). Plaintiff has not offered any such case.

The Court therefore FINDS that the constitutional right urged by plaintiff was not "clearly established" as of January 11, 1994. The doctrine of qualified immunity therefore shields the three Sergeants—Haddix, Zeitler, and Williamson—from liability.[14]

## D. Supervisory and Municipal Liability

Counts IV and V of the complaint are lodged against defendant Carey and the City of Newport News, alleging that (1) the actions of defendant Carey following Officer Rutherford's death which condoned the operation amount to a "policy or practice" of permitting the unconstitutional placement of officers in life-threatening peril without adequate protection (Count IV); and (2) Carey and the City failed to provide the training necessary to guarantee a constitutionally adequate level of protection to Newport News police officers for dangerous undercover operations (Count V).

 Both of these claims rest, ultimately, on the determination that the Sergeants' failure to protect plaintiff's decedent amounted to a constitutional violation. Because the Court has found that no such constitutional violation occurred, it follows that plaintiff's claim—that a custom or policy adopted by Carey and the City caused a violation—must fail. In short, there can be no supervisory or municipal liability when there is no underlying violation of the Constitution. *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (per curiam); *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Kopf v. Wing,*

14. Carey asserted this defense along with the Sergeants. But as it was directed to the counts of the complaint involving the "affirmative duty to protect," Carey cannot claim the shield of qualified immunity, as he is not implicated by these counts of the complaint. In any event, this conclusion does not change the result for Carey; as explained *infra,* if there was no violation of a constitutional right, supervisory liability cannot obtain.

942 F.2d 265, 269 (4th Cir.1991); *Belcher v. Oliver,* 898 F.2d 32, 36 (4th Cir.1990).

Accordingly, the motions to dismiss by defendant Carey and the City of Newport News are **GRANTED.**

The Clerk of the Court is **DIRECTED** to enter judgment for all defendants. The Clerk is **FURTHER DIRECTED** to forward copies of this opinion and order to all counsel of record.

**IT IS SO ORDERED.**